The next matter before us is 24-5079, United States v. Chafin. May it please the Court, Thomas Duncombe for the United States. Reversal is appropriate here because the question with regard to whether or not Mr. Chafin was seized on the side of the road is not whether Officer Morris's two questions on the side of the road were uncordial. The question is not whether those questions may have been impolite or blunt or direct or whether it would have felt awkward for Mr. Chafin to choose to walk away or terminate the encounter. The question instead is whether those two questions on the side of the road in a neighborhood where Mr. Chafin lived and would have felt comfortable were the functional equivalent of physical restraint. And in this case, the Court erred because those questions and the conduct of the police were not the functional equivalent of physical restraint. I'm a little confused on the government's concession about when this morphed from a voluntary encounter into a detention, investigatory detention. And, you know, at one point it seemed to be when he started pulling the black metal object out. But then when the Court asked for clarification on what exactly the government was saying, the argument seems to be this was all one encounter and that the end of that single event was when he saw he had lied about the gun. And so I'm confused on where the point is. What is the government's position on when this morphed into an investigatory detention? So the government's position is that the concession we made that is the worst possible timeline for the government is what we're stuck with. Okay. Because we did propose in briefing before the district court other points. But when the district court pointedly asked my colleague at the district court, so are you saying that it was a detention when he saw the black metal object, my colleague said yes. And so we understand that we are. I mean, we're looking at this as what would a reasonable person understand. And so what did your concession do to us in terms of our review? So this court is not constrained by our concession, but I don't want to get into a situation where we're conceding but we're trying to argue. But really the court could find that it happened later. The court could find that it happened later. But our position is that we're stuck with our concession, and so we're not trying to wiggle out of that. But the court did note, and I think astutely, that not a lot changed in the officer's behavior from the moment the officer saw the black metal object and suspected it was a gun to the factors that happened next. And the only thing I can point to is that the officer did continue asking more questions after that point. And it's not necessary for there to be a clear point where courts can draw a line and say, well, if there were seven questions during this interrogation and they were persistent and intrusive and accusatory, it was after the fourth one that it became a seizure, or it was after the fifth one that it became a seizure. But the point that we're trying to make is at least while he had only asked two questions, this was a consensual encounter and that he had reasonable suspicion from that point. The court misweighed the factors in Rogers. Do we owe any deference to the district court's application or finding of the Rogers factors? No, this court does not. So this court owes deference to the court's factual findings, but as to the weighing of the factors. The factors are highly factual. And, for example, what the briefs discuss quite a bit is the district court had the benefit of observing Officer Morris in the courtroom testifying and made findings about his commanding and authoritative presence. I can't see Officer Morris, and so when we look to the district court's findings of the Rogers factors, that was one of them. So don't we owe some deference to that factual finding as it applies to the legal factors? So there's a lot to unpack there, but let me start with what the court owes deference to and doesn't. Because the court owes deference to the finding that in court I observed him and he was authoritative and commanding. There is no factual finding on the record that on the side of the road he was authoritative or commanding. And there certainly was no finding as to the Rogers factor, which is actually whether there was aggressive language used that conveyed that compliance was required. When the court gets into and quotes Little Part 2 for, quote, this conveyed that compliance was required, that's really the legal portion of that factor. Because if this court agrees that it conveyed that compliance was required, then that's essentially the legal finding, that he was seized. There's a couple of reasons why the court's finding as to that particular factor was insufficient. The first is, as we noted, it's not the Rogers factor. And the Rogers factors aren't the end-all, be-all. But there's various cases, like Bernard, for example, that says he spoke in an authoritative tone, but it wasn't an aggressive tone. And that matters. Even the Drayton case, which was the Supreme Court, the court said there was no blocking of the exits, there was no threats, there were no aggressive languages. There was not even an authoritative tone of voice. And so that's kind of the last gasp of what might be slightly intimidating or coercive. But it's definitely not as severe under Rogers or under the Supreme Court as aggressive. And the big part that we take issue with of the courts equating the officer's tone in the courtroom with his tone while speaking to the individual on the side of the road is, it would be essentially like hearing the tone with which I speak to my 2-year-old daughter when I go home tonight, and interpreting that and saying, well, that's probably the tone that you take when you talk to everyone, which is a ridiculous assertion. And it's because tone is changeable. Tone of voice is changeable. And not just changeable, but it's something that we ask and expect officers to modulate. You can't have a test, and this test easily tells us it's supposed to provide useful guidance to police officers, where the test is, if you've got an authoritative-sounding voice just generally, don't bother trying to talk to someone on the street. The test recognizes that you can speak in an authoritative tone in some respects, and you can speak in a non-authoritative, calm, without a raised voice in other respects. So some of the factors sound like factual determinations, and so we've identified where we think there are clear errors or where a finding was clearly erroneous, and there's not many. Did you challenge persistent as being clearly erroneous? No. We've got three questions. Two, Your Honor. Well, three. Then he says, what's in your pocket? So the district court found there was two. Okay. And we think that fact is not clearly erroneous because the first one was, where's the 22? And the second one was, can I search you, or would you consent to a search? What's that? Well, right, and that happens after he sees the black metal object in the pocket, which, again, this court is not bound by our concession, but we're stuck with it.  And so the district court made a number of findings here with regard to the Rogers factors that were fact-intensive, and one of them that we challenged was the court said, kind of in an offhand way, this was an isolated area. But if that's supposed to be a stand-in for did this happen in a small, enclosed, or nonpublic place, it's belied by the record, first of all, because if you look at the defenses exhibit, Exhibit 1, which is on page 37 of the appendix, you can tell that that's not a small, enclosed, or nonpublic area. And number two is... But it's an isolated area, right? I mean, it doesn't look like there's any other people around. Well, so interestingly, the Rogers factor number eight, which is the one that we concede weighs against the government here, that one describes whether there were other members of the public present. So it would be double-counting, to use a line from a previous argument today, to count the isolated nature of the area and the fact that there were no people there, when it was only isolated in the sense that there were no people present. This was a neighborhood. This was a wide-open space. It was where Mr. Chafin lived and would have felt comfortable. And so... Well, he may have felt comfortable in the absence of a police officer standing in front of his house. So what crime was Officer Morris investigating? So at the time that Officer Morris was asking those questions, Officer Morris didn't know what he was investigating. He knew that shots had been fired right next to a neighborhood. And if that officer had heard that and said, you know what, I'm going to ignore that. I'm just going to keep dealing with this barking dog complaint, I suspect this court and most people here would be upset with that choice. And even Mr. Chafin... Officer malpracticed not to at least look into gunshots that occur right next to him.  You don't know that a crime has taken place yet. You're trying to figure it out. But him walking up to the only person coming out of the area where the gunshots happened and saying, where's the 22? Well, so let me stop you there, because a lot of the cases when evaluating whether or not a reasonable person would have felt free to leave when approached by the officers, the officers approach with different types of questions. Hey, can I ask you your name? I'm Officer so and so. We just heard some gunshots. Are you OK? That's not what happened here. Officer comes up and what looks to be accusatory in nature of question. Doesn't that make a difference? It makes this case different in kind from the cases that are at the airports that start with, hey, excuse me, may I come talk to you? But there are factors in those airport cases that differentiate them from our facts as well. And what's important here is that it was accusatory, but it was accusatory. It was significantly less accusatory than the opening lines of the opening salvos of some other cases where this court has found that there wasn't a seizure. Jones immediately comes to mind with the opening salvo being high. I'm Officer Blunt, and I'm here to take your marijuana plants. And the officer may have said at the hearing that it was all very calm and casual. But the defendant clearly didn't think so because his response was, oh, shit. So the Tafuna case also provides a situation where there's no there's no pleasantries. There's no politeness. It starts by the officer shining a bright searchlight or a takedown light on the defendant's car at 2 a.m. in a parking lot and walking up to the car and saying names and birthdays. So, yes, in a perfect world, we'd like every interaction with the police to start with pleasantries, to start with politeness, to start with hello. May I ask you some questions? But a reasonable person would understand at least that there's a little bit more directness that's called for when it's gunshots than when it's a proactive drug investigation. But, you know, I always have trouble with this test, whether a reasonable person would feel free to leave. I mean, you've got two uniformed police officers there and they're standing between the defendant and his home. You know, I know what the case law says, but really, would a reasonable person think that they could turn around and run as fast as they could back into the woods? So I want to answer that and I want to answer it directly, but I do want to make sure that I reserve time for rebuttal. So I'll do that at the end of this answer. So, yes, it's true that this test at first blush might seem not to give adequate air to the fact that a variety of people would feel uncomfortable talking to the police in any context. But in Ringgold, this court specifically said this test may seem unduly formulistic and it might seem to not give air to that concern that I just said and that you just enunciated, Judge McHugh. But any other test would fail to give sufficient latitude to police to do necessary police work. You can't have a test where the police are afraid to ask direct, blunt, or pointed questions because any direct, blunt, or pointed questioning would create a situation where it's coercion under the law. And I'd ask to reserve the rest of my time for rebuttal. Thank you. Good morning, Your Honors, and may it please the court. My name is Malia Castillo and I'm with the Federal Defender's Office for the Northern District of Oklahoma. I'm here today representing Jeremy Chapin. The district court did not err on the issue of detention. Mr. Chapin was detained at the outset of the encounter with Officer Morris and Detective Reynolds. The court in this case must consider all of the circumstances surrounding the encounter. And the ultimate question is whether the police conduct would have communicated to a reasonable person that he was not free to decline the officer's conduct or to terminate the encounter. Another phrasing for that is he was not free to ignore police presence and go about his business. So a reasonable person in Mr. Chapin's position wouldn't have felt free to leave during this encounter for the following reasons. As Judge McHugh pointed out, he was confronted by two uniformed armed officers with their guns holstered who impeded his path home. Essentially, Officer Morris intercepted Mr. Chapin as he was trying to return to his home. Additionally, there are two patrol units parked right outside of his yard. But they were unmarked, right? They were unmarked, yes. They had interior lights. And then, without explanation, Officer Morris approaches Mr. Chapin and he says, where is the 22? And as you all discussed, he did not come up and identify himself. He did not ask Mr. Chapin for identification. He did not ask, hey, have you heard gunshots in the area? He did not ask what he had been doing. He approached him with an accusatory question. And it was accusatory because he didn't ask, do you have a gun? Have you seen a gun? Well, how is that different from I'm here for your marijuana plants? Well, in that case, from what I recall, the officer was in plain clothes, didn't have an obvious weapon, leaned against the defendant's truck in that case. And as was said earlier, he testified that the encounter was very, very casual. There was nothing. It was, I think, accusatory. But under the totality of the circumstances, that wouldn't necessarily have led him to believe that that guy was even a police officer, though he was assaulted. Well, there were two of them, right? And they were in an alley behind his house. Yes. From what I recall, there were two uniformed officers further back, but the officer who had approached him was in plain clothes and didn't have any visible weapons on him. Well, in this case, one of the officers was not, was standing back, right? Yes, yeah. Nobody brandished a weapon? Nobody brandished a weapon. No one touched him? No one touched him. Yes. I do recall from that case that I think the officers were behind. They weren't impeding his path home. And I think this goes to what was discussed earlier regarding his tone of voice, and I know that that is a contentious issue on appeal. We maintain that this did not err in the factual finding that in that specific circumstance, Officer Morris was talking with an authoritative tone because when he was at the district court hearing, that's how he was talking to federal attorneys in front of a United States district judge who directly asked him a couple of questions. He was in a situation where he was defending his actions. And here, and I know this does not bear necessarily on the analysis, but subjectively he said that at that point Chafin was not free to leave. And I think that speaks to how he was treating Mr. Chafin in the moment. Can I ask you about the sort of different breaks in time and analytically how we look at this circumstance? The government has said that they can't argue reasonable suspicion from the onset. They're bound by that concession until the point in time it changes when they observe the black metal object in Mr. Chafin's pocket. Conversely, if we were to find that it was not a Fourth Amendment seizure until that point occurred, until they observed the black metal object, do you agree reversal is warranted? Yes. I still do not think that there's reasonable suspicion at that point. I know the government— So you don't agree reversal is warranted? You would still argue there was no reasonable suspicion? So I do not think reversal is warranted. So I do not think that there was reasonable suspicion at that moment. I know the government in their briefing points to the fact that Mr. Chafin lied about having a gun, but at that point Officer Morris did not think that he was lying. Well, he didn't know. He didn't say, I didn't think. He said, I didn't know. Yes, you're correct. And that's different. Yes. And we don't expect police officers to wait until the glint of steel, right? I mean, they see a black metal object. At that point, don't they have a right to investigate further? They do have a right to investigate further, but they don't have a right to detain him, and that is what we're arguing, is that they could have asked all of these questions to get to a point where it would have been reasonable to detain him, but we were saying that the detention was not reasonable. Yeah, I wanted to ask you about that. At the suppression hearing, who may be one of your colleagues, Mr. Williams, who was representing Mr. Chafin at that time, he I think told the district court that Officer Morris had a— he had reason to investigate but not detain Mr. Chafin. What is that distinction when we're talking about whether it was a seizure here? Like if you're saying they have a right to investigate, what else could they do to investigate other than to stop and talk to the one person in the area where the gunshots came from? As I was saying earlier, I think there's a few questions that he could have led with that would have made it not a detention, just an investigation. So, for example, did you hear gunshots? Have you seen anybody with a gun? Have you seen anybody else walking out in the woods? Where did you come from? Where are you going? But haven't we said—you know, I know I used that example with Mr. Duncombe, but it's the manner of the questions, how they're asked, more important than the actual questions itself, right? Yes, yeah. And as I was saying, I think both the question and then how it was asked, how the district court found that he was talked to by Officer Morris, that is what made it a detention. In combination with him being physically blocked from his home. But the district court dropped a footnote and said he was authoritative, but that I'm not changing my finding that it was not aggressive or argumentative, right? Yes, he said that explicitly that he was not threatening in any way. He didn't physically, you know, threaten or otherwise. But, you know, the standard is would somebody—did the police conduct signal to that person that compliance was required? And so that's why we're making the argument that that authoritative tone in combination with the question, in combination with him being physically blocked from his home, all of that— Well, I mean, physically blocked is probably an exaggeration. It was a rather—it was a big open space, right? Yes, but I— I mean, he could have turned around and walked back in across the railroad tracks, right? He could, but from all indication, he was walking home. And Officer Morris—I have the footnote here on page 114 of the appellate's appendix— says that he would have had to go through both him and Detective Reynolds to get to his home. Counsel, could I ask you what is your best case for essentially using non-authoritarian tones and asking warm-up questions? Do you have a case where that happened or was required? I think both Florida v. Bostick and INS v. Delgado, which those were cases in which Caesar was not found for different reasons, but I don't recall authoritative tones necessarily being used. You know, with INS v. Delgado, all the exits were blocked. The workers in that factory could not physically leave. Detention was not found in that case for a different reason than is really at issue here. The reason they couldn't leave could also be attributed to that's the nature of being at your job, is that you're not free to come and go as you please. And same with Florida v. Bostick. The nature of, you know, getting on a bus that's about to leave is that you probably couldn't leave anyway. You have argued that once he saw the metal object, that it was okay to ask further questions but not to detain. Is that your argument? So my argument is that in order for it not to be a detention from the outset, he could have asked further questions. We still maintain that he was detained from the outset. Okay, if I disagree with you and I think it was a voluntary encounter until he saw, well, and except the government's concession of when you saw the black metal object. I mean, at that point, does the officer have to turn their back to a person who might have a gun and walk away? So I think follow-up questions would have been appropriate, but I don't think that reasonable suspicion, even if the government's concession, if you do follow that, that reasonable suspicion did not exist at that point. I'm not going to argue that police officers can't continue to investigate using non-detention approaches. Well, his question was, what is that? Or what's that? His question, from what I recall, is, can I search you? No, that's earlier. And then when he says, can I search you, he starts emptying his pockets and there's a pill bottle. And when he's taking out the pill bottle, the officer, Officer Morris, sees the black metal object and he says, what's that? Oh, yes. And according to you, when he says, what's that, that was a violation of the Fourth Amendment because it was a seizure. Yes, yes. But what follow-up question could he have asked that wouldn't have been a violation of the Fourth Amendment as a seizure? You said he could ask some follow-up questions. Yes. So I still think the problem at that point is that detention doesn't make sense at that point because there was nothing that the officer did to signal to Chafin because that is the standard here, is that what were the officer's actions that would have signaled to a reasonable person in Mr. Chafin's situation that he was detained? So I think he could have asked follow-up questions. Yeah, I'm trying to figure out what follow-up question at that moment would have been okay and not a detention. If he was not detained, I think he could have investigated further. But, again, the government is conceding that he is detained at that moment. Okay. But I think what you argued was that it would have been okay to further investigate. Yes. Okay. And they did further investigate by asking, what's that? Yes. And I'm trying to understand if it was okay for them to further investigate with questions, what's wrong with the question they asked and what question would you say was okay? Yeah, assuming detention was not found, I think that further questioning would be okay. So if I don't agree with the government's concession, for example. Yes. Okay. Then you would concede that saying what's that was an appropriate further investigation. Yes. Okay. But you also a moment ago said that reversal is still not warranted because even at the point they see the black object in Mr. Chafin's pants, that they still did not have reasonable suspicion. I think a lot of these questions are getting at that. Well, at that point, reasonable suspicion is a pretty low bar. And they've heard gunshots. They see what they think may be a gun. So don't they have reasonable suspicion that at least potentially some criminal activity? And they don't have the benefit of hindsight. The district, you know, Judge Frizzell says, well, plinking is very common in Oklahoma. People like to go out and, you know, shoot cans in the woods, and that's not against the law. But they don't know. If someone's been shot, they don't know the facts and circumstances. So why isn't there reasonable suspicion at the time they see what they believe to be a gun, having just heard gunshots? So I think the characterization of the town that they are in is very important here. This is a very small town. This is not in the record, but it's only about 300 or so people. And the government's attorney at the district court level said during argument, I believe at the May 8th evidentiary hearing, that this was by no means a densely populated area. Yeah, but I can look at the exhibit, the photograph, and there's, you know, multiple houses right there where the shooting occurred. So whether it's, you know, 300 people or 30 people, there are still other people right there where the shooting occurred. Yes. So why does that make a difference? So I think there is testimony from the May 8th evidentiary hearing that within a mile of that area, there is a shooting range, and shooting is very common in rural Oklahoma. They're very, you know, pro-Second Amendment. And so that's not uncommon. Like I said, there's no bar to investigating, but the bar here is for detention. You can't walk up to somebody and detain them just because there are shots going on. Investigation is fine, though. If there is no further questions. I will make actually one last point. So the government here has the burden of proving specific and articulable facts that criminal activity was afoot. And I think to your point, somebody could have been shot very theoretically, but there are no specific and articulable facts that point to that shooting being, one, illegal at all. Somebody was shooting where it was legally allowed in rural Oklahoma, and there's no evidence that anybody was in danger. Nobody screamed. There weren't any other folks around complaining. And so that's why I will leave my argument if there are no further questions. Thank you. Thank you all. I want to address two things in rebuttal. The first is the house and whether they were blocking it, and the second is the reasonable suspicion that they had. First, the blocking of the house is a very minor factor here if it carries any weight at all. The cases are clear that the question isn't whether a reasonable person would have felt free to leave. It's whether the conduct of the officers would have led to a reasonable person feeling that they weren't free to leave. And easily, this Court said coercive means a coercive environment created by the officers. At the time, Mr. Chafin came out of the woods and over the railroad tracks and started walking toward the officers, they were already set where they were in the middle of the road. They did nothing to create an impediment to Mr. Chafin's house. And as to the reasonable suspicion, I would point this Court to Young, but I would also point this Court to the facts in Connor where there was a near-anonymous 911 call, there was a no-no, and there was a gun scene. And so the reasonable suspicion was not any specific crime, but it was that he may have done something he was not allowed to do with a gun and then was trying to lie about it to a police officer. Thank you. Thank you.